ZENUS SWEET, ADMINISTRATOR, ETC., v. THE MICHIGAN CENTRAL RAILROAD COMPANY.

*Master and servant—Railroad companies—Assumption of risks— Contributory negligence—Trial—Conduct of counsel.*

1. Constructing and maintaining a side track so near to a building in the yards of a railroad company, and under its control, as to endanger the lives of its employés while switching cars on said track, is a violation of the duty of the company to provide a safe place for its employés to work in.

2. Where in such a case an employé is killed by being crushed between the car upon which he was braking and the building, and the testimony fails to show that he had ever before switched a car on said side track or past the building, or that he had any reason to apprehend the existence of such *special* danger, it is a question for the jury, under all of the testimony, to determine whether he knew or ought to have known of such danger.

3. It is not proper for counsel upon either side to attempt to play either upon the pride or prejudices of the jury; but where the attorney for the losing party is the aggressor in matters of this kind, thereby challenging a reply from his opponent, the Court is not called upon to punish the latter's client for an indiscretion of his counsel thus called out in the heated trial of an important cause, unless it appears quite plainly that the verdict was influenced thereby.

Error to Washtenaw. (Kinne, J.) Argued July 1, 1891. Decided October 9, 1891.

Negligence case. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Henry Russel* (*H. M. Campbell*, of counsel), for appellant.

*Sawyer & Knowlton*, for plaintiff.

MORSE, J. This is an action for damages based on the negligent killing of plaintiff's intestate. The plaintiff had verdict and judgment for $5,000. The facts are substantially as follows:

A part of defendant's station yards or grounds at Detroit is called the "Bay City Yard," in which is a side track called the "Bentley Siding." On this track stands a long, low, irregular building, called "Bentley's Oil Works," or "Sheds." This side track is constructed and used for the Bentley oil works, and nothing else. It is 47 feet from the switch to the south end of the building. The length of a car is 34 feet. The track upon which this building is located runs somewhat in a circle, but its general course is north and south. The switch is south or south-west of the building. The oil shed or building stands on the easterly or northerly side, and the main track is on the west side of the Bentley side track. The top of a car is higher than the roof of this shed or building. The building is constructed in sections. The second section cannot be seen from the south end, when standing at the switch. It sets back a foot or two from the other portion of the building. The office of the building is in that jog. Passing that, there is another building at the end of it. The south end of this building, or tank, or shed, is not perpendicular. The space between the side of the car while passing and the building is 16 inches at the south end, and, as the car goes north, it grows smaller, until the

end of the first section of the house is reached, when the space closes up to 13 inches. This is occasioned partly by the building righting up, and becoming nearer perpendicular at the north end than it is at the south end. At the south end of the building there are double doors, both swinging out. At the time of the accident these doors seem to have been open, thus acting as the lips of a funnel, and might have presented a very deceiving appearance. The doors are over five feet wide, and, when open, leave only a space of 42 feet from the switch to the entrance of the funnel. This building had been standing there for five years, and was wholly upon the grounds of the defendant.

Plaintiff's intestate was 26 years old at the time of his death. He was married, and left surviving him one child, a daughter three years old, and his widow, Louise Sweet. He was a saving, prudent man, and was receiving $60 a month at the time of his death. He had been in the employ of the defendant for some time as brakeman on the eastern division of the main line, from Jackson to Detroit. While on that division he received an injury. After his injury he went into the employ of the defendant again as switchman in its yards at Detroit, and was in the employ of the defendant in that capacity a month or six weeks before the accident.

The switching team of which Sweet was a member was composed of Frasier, Maroney, and Sweet. Their duties as a switching team extended to any part of the company's yards at Detroit, but their chief labors seem to have been expended in that portion of the defendant's yards called the "Bay City Yards." There is no direct evidence that Sweet was ever on the Bentley siding before the accident. There is no evidence that his attention had ever been called to the dangerous proximity of the build-

87 MICH.—36.

ing, but there was evidence tending to show that cars were probably shipped in there from once to twice a day. There is no claim that he was ever informed by any one that the place was dangerous, or of the location of the shed, as connected with the railroad track.

The manner of the accident was as follows: The switching team came down from Bay City Junction on the main track, with two cars attached to the engine, and backed in on the Bentley siding, and coupled on to a car, and then pulled back over the switch and onto the main track. Sweet stood at the switch, and, as the train pulled out from the switch; threw it back onto the main line. The engine then pushed the car that had been taken from the siding down the main line, past the switch. Maroney rode that car down the main line, and stopped it. The engine then pulled up beyond the switch again on the main line, and Sweet threw the switch back to the Bentley siding, and stood at the switch. The engineer then pushed a stock-car for the siding. Frasier cut off the car, and the engineer pushed it down the track onto the Bentley siding, following it with the engine; and, as the north end of the car passed the switch, Sweet got onto it. He was then upon the east side of it, next the building. When Sweet got onto the north end of the car, naturally he was looking south, towards the approaching car as it came to the switch, and when he got onto it his face would be away from the building. Frasier was on the south end. Seeing Sweet get on, he (Frasier) dropped off at the switch. The car thus cut off was a Michigan Central combination stock-car. These cars are slatted lengthwise. The posts, or studs, upon which the slats are nailed, are on the outside of the car. There are two ladders to this car, placed upon opposite sides, near the opposite ends of the.

car. In order to stop the car it was necessary to reach the top of it by these ladders. These cars are more difficult to mount than an ordinary box-car, for the reason that the slats are left apart, and, unless special attention is paid, the foot is liable to strike through the holes in the side of the car, and slip off the rounds of the ladder, and it therefore draws a person's attention more closely when mounting than it would on a box-car.

In the division of the work, it is the practice for the switchman who throws the switch to mount the car that is kicked on the siding as it passes him, set the brakes, and stop it at the place desired, and for the switchman who cuts off the car to drop off at the switch, and throw it back to the main line; and this seems to have been attempted in this case. At this time Frasier cut off this car, rode it down to the switch, and, looking through the slats of the car, saw Sweet mount upon the other side. Frasier then dropped off at the switch, to throw it back upon the main line. The engine was pushing the car, and the fireman did not know it was cut off. It was Sweet's duty to get on, and Frasier's duty to get off, at the switch, in the manner it was done; and, according to the custom of doing the work, it was the duty of one of them to get on the car at any event. There was testimony tending to show that generally, in handling cars upon this side track, the men work upon the side of the cars away from the building.

The car was 34 feet long. It was only 47 feet from the switch to the building, and the doors, being open, reduced that distance five feet. From the switch to the funnel, therefore, was only 42 feet. This car was going as fast as a man could walk. Sweet, therefore, only had the time it would take a man to walk 42 feet, from the time he attempted to mount the car until he was crushed. As he attempted to mount the car he took hold of one

of the rounds of the ladder, and put either his foot or his knee upon the step of the car,—that is, the bottom step under the car,—and looked towards the car. He had only straightened up by the side of the car when the fireman, seeing his danger, hallooed to him to look out for the shed. He heard the noise, but did not comprehend what he said. He looked up, and smiled to the fireman, as though he thought he was joking, and in an instant was between the car and the shed, and was rolled the distance of the first section of the oil-shed between the car and the shed, and when he reached the end of that section he dropped down to the ground, and striking upon his feet, with his back against the shed, stood in that position, while the engine stopped, and the fireman got down and started to go to him, but before he got to him he fell back upon the ground, striking his head against the rail. They picked him up, and carried him into Bentley's oil works, and laid him on the floor. He lived about 30 minutes, and said to Frasier, "Take me home to my wife."

The negligence of the defendant is apparent, and does not seem to be disputed. It was the duty of the defendant to provide a safe place for the men· to work in the yards. There is shown no excuse for the laying of this track so close to the building. It was unsafe and dangerous. Indeed, the claim made by defendant's counsel is that it was so obviously unsafe that the plaintiff's· intestate was presumed, as a matter of law, to have taken notice of it. The building was on defendant's premises and under its control, and its tracks, at least, could have been changed to prevent the accident.

The principal error assigned against the verdict is that the plaintiff's intestate was guilty of contributory negligence as a matter of law, because, by reasonable observation, he might have known of the danger incident to the

situation, and therefore he assumed the risk, and no recovery can be had.

The court instructed the jury upon this question as follows:

"Now, gentlemen, in order for the plaintiff to recover in this case he must satisfy you, by a fair preponderance of evidence, of several things:

"1. That the decedent, John H. Sweet, was not guilty of contributory negligence; for, if the want of ordinary care and prudence on the part of Mr. Sweet in any degree contributed to this accident, plaintiff cannot recover. In other words, if the decedent, Mr. Sweet, by the exercise of due care and ordinary caution, could have avoided this injury, he cannot recover.

"2. If, from the evidence in this case, you find that the decedent was not guilty of contributory negligence, as I have defined it to you, then, before the plaintiff can recover, you must also find, and you must be further satisfied by a fair preponderance of evidence, that the defendant corporation was itself guilty of negligence; that is, that it has been guilty of a neglect of that care, caution, and prudence which good railroading requires.

"3. When Mr. Sweet entered the employment of the railroad company, he assumed the risks and perils usually incident to such employment, and included in such risks and perils were those which it was his duty to take notice of by observation. All the perils, chances, and risks which were apparent, obvious, and open to observation, these Mr. Sweet assumed; and, if this accident resulted from this risk, there can be no recovery. The defendant corporation had a right to rest upon the probability that Mr. Sweet would know what was generally to be seen by his own observation,—his sight.

"On the other hand, gentlemen, Mr. Sweet had a right to assume that the railroad company had done its duty, and placed its tracks in such a condition as good railroading would demand, and so that he could perform his duty with reasonable safety, and he did not assume any such unusual or extraordinary risks as, without fault on his part, he might be exposed to through the negligence of the defendant; and if, in the discharge of his duties, the decedent, Mr. Sweet, was exposed to such dangers and perils as are unusual, exceptional, and not

fairly incident to good railroading, and such perils as one in the faithful discharge of his duties could not ordinarily be expected to foresee, then it was the duty of the railroad company to have apprised him of such danger and perils; and if they neglected such duty, and decedent himself was unconscious of the danger, and, while exercising due care and caution, failed to observe the danger and peril, then these facts would be circumstances in this case which you may consider in determining the question whether or not the plaintiff is entitled to recover. And in determining the question whether or not the decedent, Mr. Sweet, was guilty of contributory negligence, you may consider the exigencies and all the surroundings of the situation, and therefrom conclude whether or not the decedent, Mr. Sweet, was in the exercise of that degree of care and caution which were incumbent upon a man of ordinary prudence in the same calling and under the circumstances which surrounded him at the time of this accident; and you must determine whether or not in the exercise of due care, under the circumstances of the case, he was bound to appreciate the danger that confronted him.

"If, from the evidence in this case, you are satisfied that Mr. Sweet knew of this danger, and that this accident was due to his own negligence and inadvertence, and arose from a want of ordinary caution and prudence on his part, plaintiff cannot recover. Or if you are satisfied, from the evidence in this case, that this danger was so obvious, so patent and discernible, that a man in the exercise of ordinary care and prudence would have avoided it, then the plaintiff cannot recover. If, however, you are satisfied, from the evidence in this case, that the ordinary use of this side track, with the buildings thereon so located in such proximity to it, was unsafe and dangerous; that it was improper and negligent railroad management; and you further find, under all the circumstances of this case, that the decedent, Mr. Sweet, was blameless; that he was in the exercise of due care and caution at the time of this injury; and that he did not contribute to this accident,—then the plaintiff is entitled to recover.

"I give you certain requests on the part of the plaintiff:

"'It is the duty of the defendant to provide a reasonably safe place in which to do its work, and, if the jury shall find from the

evidence in this case that the defendant corporation failed in this respect, it was guilty of negligence. This duty of the master—that'is, the railroad company—to provide a reasonably safe place in which to perform the service required of its servants, in railroad business extends to the construction of its line, and renders it liable to its servants for injuries, arising in the necessary discharge of duty, caused by the location in dangerous proximity to its line or side track of any structure over which it may rightfully exercise exclusive control,—cattle-chutes, signal posts, water-tank, piles of lumber, awnings, and buildings.

"'It is also a rule of law that when a person injured so far contributed to the injury by his want of ordinary care that, but for the want of such ordinary care on his part, the injury would not have been done, the railroad company is not liable to plaintiff in damages for such injury. But the duty of ordinary care upon the part of the person injured for his own safety is not unvarying, but is dependent upon circumstances of the particular case. The mere fact, therefore, that the deceased knew the building stood near the track, may not necessarily charge him with contributory negligence, or the assumption of the risk; but the question is, did he know, or ought he to have known in the exercise of ordinary common sense and prudence, that the risk and danger existed?'

"I give certain requests on the part of the defendant:

"'If the deceased knew that the shed of the Bentley Oil Company stood so near the side track as to render it unsafe for the employés of the railroad company to ride past it on the ladder on the side of the car, the plaintiff is not entitled to recover.

"'For about three weeks the deceased was employed almost daily in and about the side track leading to the Bentley oil-shed, and if he might have known, by the exercise of reasonable care and observation, what the danger was from the proximity of the shed to the track, he cannot recover, even though he did not know or appreciate it.

"'It was the duty of the deceased to observe and learn all that he reasonably could about the places in which he was called upon to work, and the risks and dangers connected therewith, and if his failure to do so contributed to this injury he cannot recover. If the deceased, while standing at this switch, could have told that the shed was so close to the track as to render it dangerous to ride by on the ladder, this fact you may take into consideration in determining the question whether or not the deceased was guilty of contributory negligence. It was the duty of the deceased to observe the premises where his duties were performed, and to use his eye-sight.

"'The responsibility of a railroad company to its employés for

the condition of its road is less strict than it would be to strangers, and an accident to an employé involving no liability might, if it happened to another person, cause actionable injury.

"'Railroad employés are presumed to be aware of, and to take the risk of dangers from, such conditions and defects in the construction of the side track as would be open to observation, and they are also expected to use reasonable care in examining their surroundings.

"'While it is the duty of the defendant to furnish sufficient and safe material, machinery, and other means by which the work of the employed is to be performed, and keep the same in order and repair, and its contract implies that, in regard to these matters, the employer will make adequate provision against negligence on the part of the company, and that no danger shall ensue to him therefrom, it is well settled that the employed assumes all the risks and peril usually incident to the employment, and that included in such risks and perils are those which it is a part of the duty of the employed to take notice of by observation.

"'The plaintiff charges that the defendant is guilty of negligence because of the failure of the employés or officers of the company to assume the probability of some brakeman or switchman clinging to the side of the car next to the shed, and being injured, because there was not sufficient space to permit him to pass in safety. You are not necessarily to suppose that any one employé or officer of the defendant would be any more observant of the possibility of such danger than another. It is for you to determine whether the deceased himself, during his employment in the yard, had not as many facilities to learn the situation of the shed and track, with reference to riding through, as any other employé of the company. If the deceased had such opportunity, he was guilty of negligence which contributed to the injury, and plaintiff cannot recover.'"

We think the matter was fairly submitted to the jury.

Defendant's counsel in this case rely mainly upon the case of *Illick v. Railroad Co.*, 67 Mich. 636; but the following excerpt from the opinion in that case will show that it differs materially from the case before us:

"The space between the side of the bridge and the ladder upon the car where the brakeman was injured, as shown by the record, was two feet and three inches wide. The danger in going up the ladder at that place was before him, and was as plain to his observation as to any person connected with the train, or whose duty it was to run upon the road. It was not his duty, on the

signal for brakes, to go up the ladder when the service was fraught with such danger. There was no special request for any person in charge of or controlling the train for him to make the perilous ascent; and, when he did so, it was at his own peril.

"The duties of his employment did not require him to go upon the box-car until he had passed the bridge. It did, however, require him to observe and take knowledge of the danger, if any, in crossing the bridge, if such knowledge could be obtained by his own observation. He had crossed the bridge 200 times before he was injured; and each time he crossed furnished him an opportunity of observing the very danger which overtook him and caused his death.

"The bridge was sound, and safe for the passage of trains, without defect, and in good repair. Whether it was 14 or 24 feet wide was a matter of no concern to the brakeman, so long as he was not required to occupy a place of danger in the discharge of his duties while passing over it, and this he was not required to do.

"A railroad company cannot be required to condemn and remove a bridge which is without fault in its plan or defect in its structure, while it is in good repair, and safe for the passage of trains, simply because some engineer shall pronounce it not as good or convenient as some other kind. Railroad companies must be allowed to use their own discretion as to the kind of bridges they will use, and when and under what circumstances they will remove or replace them, while they are safe. Any other rule would be both unjust and oppressive."

It will be seen that it was not the duty of Illick to go up the ladder when he did; nor was the company negligent in maintaining the bridge. He had crossed the bridge 200 times before this, and each time had opportunity to examine it, and notice the danger. Here there is no testimony that Sweet ever passed the place before, and, if he did, that he was not on top of the car, or on the opposite side, where the danger might not be discernible. It was in the performance of his duties that he was killed.

It may be assumed that he must have seen that the

cars passed very close to the building, and it is claimed that he must have noticed that a man upon the ladder could not pass through there without getting hurt, as one witness testified that any one could see it who looked through there. But the trouble is that there is no evidence that Sweet was ever called upon to stand at the switch, or back of it, and look through there when a car was passing the building. It is not shown that he ever helped to switch a car on that track or past this building. Under such circumstances, is he to be conclusively presumed negligent in not having informed himself of the danger? I think not. Until he had some reason to apprehend the existence of this danger, not ordinarily incident to his employment, his conduct might well be influenced by the assumption that his employer had regard for its duty, and would not negligently expose him to extraordinary peril. *Robel v. Railway Co.*, 35 Minn. 84 (27 N. W. Rep. 305).

At the time of the accident he was standing with his back to the building, waiting for the appearance of the car, and, standing thus, jumped upon the car to ascend the ladder, turning his face, as he naturally would, towards the car, and having regard at that moment for his safe ascent to the top. In another moment he was caught and crushed to death.

It was a question for the jury, under all the testimony, to determine whether Sweet knew or ought to have known of this danger, and we think the charge of the court was eminently fair to the defendant.

The only other error complained of is to the remarks of Mr. Sawyer, of counsel for the plaintiff, in his closing argument. What is complained of is stated in the record as follows:

In the course of Mr. Sawyer's argument to the jury, the following language was used:

"*Mr. Sawyer:* One word upon the subject of contributory negligence, etc. If juries go against railroads,—if they cannot be trusted in railroad cases if they are given to them,—it is because in every case the railroads are inimical to the plaintiff.

"*Mr. Whitman:* The statement is made that the Michigan Central Railroad Company is unjust and cruel and inhuman. It is not true, and I take exceptions to it.

"*Mr. Sawyer:* I said I asked of this jury the same consideration of the rules of right and law that I would ask between two men engaged in the same trouble. I say, further, that when my Brother Whitman came to close the case for the defendant he called the attention of this jury to the fact that this was a railroad case, and it was talked upon the street everywhere that, if a party could get by the court and get to a jury in a railroad case, the jury would 'whoop it up' to a railroad company. I say, in answer to that, what I have said, and repeat it: If there is one single, solitary jot or tittle in what my brother says about it, it is simply because, in cases of this character, where a husband and father has been slaughtered by the negligence, as I think, of the railroad company, or as I think the evidence in this case shows the railroad has done, if it were between man and man, the man would go to the woman and child, and say some kind word to her, and do some kind act for her; at least, would pay the funeral expenses of the man he had killed, and would not suffer her to go abroad across the land, weeping for want of a word of consolation in her heart, and would do something to settle with her, or offer to settle with her, instead of saying to her, 'Go to hell.' I say that, and I do not charge anything against these gentlemen; I know them all, and I know them well.

"*Mr. Campbell:* I desire to take exception to these last remarks, and I think I am entitled to it when he says we crushed the life out of this man, and then told the widow and child to 'go to hell.'

"*Mr. Sawyer:* If the stenographer will take the language all in its connection, I have not the slightest objection. I say the language was figurative.

"*The Court:* The stenographer will note what you say.

"*Mr. Sawyer:* We do not ask at the hands of this jury one thing that is different from what we would ask

from a man. We do not ask any vindictive damages; we ask nothing because it is against a railroad company."

Some of the expressions used by Mr. Sawyer were decidedly improper, and if they had been used without provocation, and not in reply to a similar breach of professional decorum on the part of one of the defendant's counsel, would have been sufficient to reverse the judgment. But the counsel for the defendant was the first, as appears from the record, to introduce into the case any question as to there being any difference between it and the ordinary litigation between man and man. The remark attributed to Mr. Whitman by Mr. Sawyer must be taken, as the record stands, it not being denied, to have been uttered. Its object could only have been to influence the jury in favor of his client by giving them to understand that people outside expected they would not do their duty, but find against the railroad company, as a matter of course, if the court should give them a chance to do so. Mr. Sawyer attempted to meet it by saying, in substance, that the railroad company deserved it.

It was not proper for either of these gentlemen thus to attempt to play either upon the pride or prejudices of the jury; and that it is often done by attorneys is no excuse for so doing. But where the attorney for the losing party is the aggressor in matters of this kind, thereby challenging a reply from his opponent, I do not think the Court should punish the latter's client for an indiscretion thus called out in the heated trial of an important cause, unless it appears quite plainly that the verdict was influenced thereby. Certainly in this case there can be no claim that the damages allowed are excessive, and we are not prepared to say, nor do we think, that if Mr. Sawyer had not made these remarks the jury would have found for the defendant.

The judgment is affirmed, with costs.

CHAMPLIN, C. J., McGRATH and LONG, JJ., concurred with MORSE, J.

GRANT, J. *(dissenting)*. I think the verdict and judgment in this case should be set aside, on account of the intemperate and unjustifiable language used by counsel for the plaintiff in his argument to the jury, which is stated in the opinion of my Brother MORSE. It is conceded to have been improper, and that its natural tendency was to greatly prejudice the jury. The remarks were duly objected and excepted to by the defendant's counsel.

Assuming that defendant's counsel in his argument to the jury used the language attributed to him in the remarks of plaintiff's counsel, I do not think that furnishes any excuse for the use of the language complained of. It does not appear that plaintiff's counsel made any objections to the improper remarks attributed by him to counsel for defendant. Counsel for one side should not be permitted to sit by and listen without objection to improper remarks from the other side, and then be permitted, under objection, to get even by going outside the record himself, and using language like that in the present case. The only orderly and proper way in such a case is for the opposing counsel to object, and ask the court to stop the use of such language. It might as well be contended that, when one counsel permits incompetent evidence to be introduced by the other side without objection, he should be permitted, under objection, to introduce other incompetent evidence; that in such case no complaint can be made. When incompetent evidence has been introduced without objection, the opposite side has, of course, the right to contradict it by other evidence; but the rule extends no further.

Plaintiff's counsel would undoubtedly have · been justified in meeting the statement of defendant's counsel by a denial, and by an argument upon the statement. But it needs no argument to show that the language used was not confined within this limit. The law should not, and in my judgment does not, sanction the practice allowed by the court in this case. It is the clear duty of trial courts to see that counsel in their arguments are confined· to the record, and that no improper efforts are used to prejudice a jury.

Judgment should be reversed, and a new trial ordered.