[No. 4479.    Decided April 18, 1903.]

S. W. McDANNALD, *Respondent*, v. WASHINGTON AND COLUMBIA RIVER RAILWAY COMPANY, *Appellant*.

NEGLIGENCE — INJURIES TO SERVANT — DANGEROUS APPLIANCES — QUESTION FOR JURY.

The question of a railway company's negligence in erecting and maintaining cattle guards in close proximity to its tracks is one for the jury, where it appears that a trainman was injured by striking against one while attempting to board a car; that the guard was within about eighty-five feet of a customary stopping place, which required the trainmen to get off the cars in the discharge of their duties; and that the cattle guard posts were within twelve or fourteen inches of the cars at that point, while there appeared to be no necessity for such close location, and in fact at other points along the road such posts were located farther from the track.

SAME — ASSUMPTION OF RISK — CONTRIBUTORY NEGLIGENCE.

The questions of plaintiff's contributory negligence and assumption of risks are for the jury, where it appears that he was the conductor of a freight train; that, after stopping at a station, the train was slowly starting up again, and that plaintiff, in order to board it, ran to a road crossing and caught hold of the hand rail on the caboose; that at the moment his attention was called to an intending passenger running toward the train and his foot slipped off the car step and he was thrown against a cattle guard located about twenty-five feet beyond the point where he started to board the train; that he could have seen the cattle guard, if his attention had been called to it; that he did not know of its dangerous position in relation to the track; and that the posts of the cattle guard were much closer to the track than in his experience such posts were usually located, and were closer than any others along defendant's line of railway.

APPEAL — HARMLESS ERROR — REFUSAL TO STRIKE IRRESPONSIVE ANS-
WER — CURED BY INSTRUCTIONS.

The refusal of the court to strike an answer that was not
responsive was not prejudicial error, where the court subse-
quently told the jury they could not consider evidence of that
character.

SAME — INSTRUCTIONS NOT WITHIN ISSUES.

The modification by the court of a requested instruction stat-
ing a general rule of law by adding thereto an exception to the
general rule would not be prejudicial, although not within the
issues of the case, when the adverse party did not claim recov-
ery by reason of the exception and there was evidently no inten-
tion of the court to apply the exception to the case on trial.

EXCESSIVE DAMAGES.

A verdict for $10,000 on account of personal injuries is exces-
cessive, where no bones were broken, no disfigurement inflicted,
and the evidence of permanent impairment very slight, showing
only an injury to the nervous system which might or·might not
remain permanently; it appearing that plaintiff though incapaci-
tated for work more or less for a period of several months, and
having suffered much pain, had been in bed from his injuries
but six days, and that the trial court expressed grave doubts
as to the justice of the verdict in passing upon a motion for a
new trial.

Appeal from Superior Court, Walla Walla County.—
Hon. Thomas. H. Brents, Judge. Modified.

*B. S. Grosscup* and *W. T. Dovell,* for appellant.

*Garrecht & Dunphy* and *Bennett & Sinnott,* for respond-
ent.

The opinion of the court was delivered by

Mount, J.—Action for personal injuries. Plaintiff
obtained judgment in the court below for $10,000. De-
fendant appeals.

The appellant is a railroad company operating a line of
railway between Walla Walla and Pleasant View in Walla
Walla county, Washington. On September 15, 1901, the

respondent was an employee of appellant company as con-
ductor in charge of one of appellant's trains of cars oper-
ated between the points above mentioned. This train,
going out of Walla Walla on the morning of September
15th, consisted of an engine, four water-tank cars, several
box cars for freight, a caboose, and a regular passenger
coach. On the way out one of the water-tank cars was left
at a place known as "Day's Cistern." The place of this
cistern was not a regular station, but the trains stopped
there whenever water was to be left or cars picked up,
and had been doing so for eight years. There was no
switch at this point, and cars loaded with water were left
standing on the main track, and the water was drawn from
the car by means of a trough from the car to the cistern.
When the water-tank car was left at this point, the valve
of the tank was opened and the car left to empty itself,
while the train proceeded on to Pleasant View. On the
way back to Walla Walla the train consisted of the engine,
two freight cars, the caboose, and the passenger car. When
the train arrived at Day's Cistern a brakeman was sent
forward by the conductor to couple the water-tank car on
to the engine in front. This car was not quite empty and a
delay of some few minutes was occasioned. The respond-
ent thereupon, as was his duty, got off the train, and went
forward to the head of the train to see what was the cause
of the delay. About the time he arrived there the tank-
car was emptied and the car coupled on to the engine in
front, and the respondent gave the signal to go ahead. The
track at this point was on a grade some three and one-half
or four feet high. About fifty feet beyond the cistern, on
the same side of the track easterly and in the direction the
train was going, was a wagon roadway graded up so as to
make a crossing over the railway track. This wagon

roadway·was about sixteen feet wide.   About fifteen feet beyond the wagon roadway was a cattle guard of three posts on each side of the track parallel therewith, on which boards were fastened, and up to which a barbed wire fence connected on each side of the track.   The posts of the cattle guard were about two feet four inches from the rail of the track at the bottom, and slanted out from the perpendicular about eight inches or a foot at the top.   These posts were about five feet in height.   The cars projected over the rail about two feet three inches, so that there was a space of about twelve inches between the side of the car and the top of the cattle guard posts.   On account of the high grade along this place, the conductor was not able to get on to the train at the place where he gave the signal to go ahead, so he ran forward a distance of about fifty feet to the road crossing, in order to get on to the train when the rear cars came up to him.   The train was running at the rate of about five miles per hour.   It was shown that it was usual for the conductor and train men to get on the train when it was in motion.   When the rear end of the caboose came up to where the respondent was, he was on the left-hand side of the train as it was going easterly.   He took hold of the handles on the side of the car, and attempted to step on the rear end of the caboose. Just then his attention was called by a passenger standing on the rear platform of the passenger coach to a man who was running towards the train evidently desiring passage thereon.   Thereupon the respondent's foot slipped, and he had to make another step for the car.   He did not see the cattle-guard posts, and, while he was in the act of getting on the train, he was carried against one of these posts, which struck him on the back and knocked him under the car.   He was struck again by the brakebeam, and thrown

from under the car and injured. Respondent had made five trips over the road prior to this one, but had not stopped at this place before. He did not know of the nearness of the cattle guard posts to the side of the car. There were some thirty of these cattle guards along this line, but only two of them were as near to the car as this one. Respondent did not know that there was any difference in the location of these cattle guards with reference to their proximity to the track. It was broad day light, and respondent could have seen the posts if he had looked, but, with his attention called to the passenger in the opposite direction, and while looking for a footing on the steps, he did not see it until after he was struck. There was some defect in the step of the car, but it is conceded that respondent knew of this, and that he cannot recover in this action on account thereof.

The principal questions in the case are whether it was negligence for the appellant to maintain the cattle guard so near the track, and, if so, did the respondent know or should he have seen the danger, and had he therefore assumed the obvious risk? We think both of these questions, under the circumstances of this case, were properly questions for the jury. If the erection and maintenance of the cattle guard so near the side of the track was such that an ordinarily prudent person should have foreseen that an accident was liable to happen to persons who had a right to be upon the side of a passenger train at this point, then it was negligence of the company to place it and maintain it there. The conditions surrounding each particular case have much to do in determining what a prudent person would do. When it was shown that this cattle guard was within about eighty-five feet of a station or place where trains were accustomed to stop, where the train men were

usually at or upon the side of the cars, where the posts are so close to the side of the car that there is only a space of twelve or fourteen inches between the posts and the car, and where there appears to be no necessity for such location of the posts, the question of negligence is one for the jury.

Counsel for appellant, however, rely upon the second point, and insist that the respondent, under the circumstances of this case, must be held to have assumed the risk. Numerous authorities are cited from this court and other courts to the effect that where an employee knows, or in the reasonable exercise of his faculties should know, the dangers which surround him, he must be held to have assumed the risk. The following cases are cited from this court: *Week v. Fremont Mill Co.*, 3 Wash. 629 (29 Pac. 215); *Jennings v. Tacoma Ry. & Motor Co.*, 7 Wash. 275 (34 Pac. 937); *Bullivant v. Spokane*, 14 Wash. 577 (45 Pac. 42); *Hoffman v. American Foundry Co.*, 18 Wash. 287 (51 Pac. 385); *Anderson v. Inland Telephone, etc., Co.*, 19 Wash. 575 (53 Pac. 657, 41 L. R. A. 410); *Brown v. Tabor Mill Co.*, 22 Wash. 317 (60 Pac. 1126); *French v. First Avenue Ry. Co.*, 24 Wash. 83 (63 Pac. 1108); *Robare v. Seattle Traction Co.*, 24 Wash. 577 (64 Pac. 784); *Danuser v. M. Seller & Co.*, 24 Wash. 565 (64 Pac. 783). It is unnecessary to review these cases separately. They all, in effect, announce the rule stated above. It is enough to say that in each of the cases cited it was held either that the plaintiff knew of the danger, or that he should have known it in the exercise of ordinary observation. In this case it is not contended that the respondent knew of the cattle guard post by which he was injured. The evidence shows conclusively that he did not know of its dangerous position in relation to the track. The ques-

tion then narrows down to whether he should have known it. In this respect this case is more like the case of *Johnson v. Tacoma Mill Co.,* 22 Wash. 88 (60 Pac. 53), than any of the cases from this court above cited. In that case, where a carpenter was employed to change a pipe in a mill, he was injured by stepping backward into a barrel of hot water. The barrel was sunk into the ground, and unnoticeable by reason of the fact that pieces of bark were floating on the surface of the water. In that case, after reviewing some of the cases above cited, the court said:

"But how different this case is from any of the cases above noticed! There is no question involved here of working with dangerous machinery or of working in the immediate vicinity of dangerous machinery. The plaintiff was not injured by anything he was working with or upon. The cause of his injury was entirely disconnected with, and separate and distinct from, the subject of his work. It is true that if a man is working in a mill or factory, where common intelligence will take notice that dangerous machinery is used, and steps back upon a saw or into a furnace, or upon any dangerous device or machine, he cannot recover damages, because, being charged with knowledge of the existence of these dangerous objects, the danger must be held to be apparent; and while it is true that the plaintiff in this case could doubtless have seen the barrel, if he had looked at it,—and that is the admission which the counsel for respondent sought to obtain, and did obtain —he was under no *obligation* to look for it, and naturally would not look for it, for he had no actual notice of. its existence, and it does not appear that it was a necessary or common attachment to mills, or, if it was, that it was the custom to leave it uncovered. It was not a danger incident to the business of putting up a pipe, and under the testimony it was not so conspicuous as to challenge attention; and the plaintiff, being rightfully there in the discharge of his duty, had a right to rely upon the duty of the master to furnish him a safe place in which to work, and

the place evidently not being safe and the danger not ap-
parent, the master, under the authorities, is liable to dam-
ages."

The circumstances of that case, it is true, are not the
same as those in the one before us, but the case serves to
show that the difficulty in all cases of this character is not
with the rule of law, because the rule of law is well settled
and understood, but arises when we come to apply the rule
to cases where the danger is not known, and where it must
be determined from the facts that the danger should have
been known by the employee. The question, then, resolves
itself into this: Do the facts in this case show that re-
spondent should have known the danger? The facts are
not disputed, and they are, substantially, that respondent
was boarding the train in the usual and ordinary way;
that the train was running slowly; that he was about
twenty-five feet away from the cattle guard posts; that if
his attention had been directed towards these posts he
could have seen them; that this was the first time he had
stopped off at this place; that he could not board the train
except at the crossing; that he had been in the railroad
business for about twenty years, was acquainted with the
location of cattle guards, and had never known them to be
placed so near the track as this one, or to be dangerous;
that it was necessary, when boarding a moving train, to
look toward the rear of the train, not in the direction the
train was moving, and that it was also his duty to look
after passengers desiring to board the train; and, while
the plaintiff testified that if his attention had been called
to the cattle guard he could have seen it, yet it nowhere
appears that he could have known, even if he had seen the
cattle guard, that it was dangerously close to the cars. We
know from common experience that it is difficult to tell
how near a car will come to objects along the side of a

railway track, and, until the car stands by the object, one cannot very well judge whether it is dangerous or not. We know, too, that the respondent's attention must have been centered on boarding the train, as he says it was, and that a customary object near the track, like a cattle guard, would not ordinarily attract attention as a dangerous obstacle. Even if respondent could have seen the cattle guard when he ran forward to within twenty-five or thirty feet of it, or even if he should have seen it, we do not think it necessarily follows that he must be held to have known that is was dangerous, especially in the absence of warning or knowledge that it was dangerous; because, in the absence of warning or knowledge, he had a right to assume it was safe, and that it was placed as was usual and customary for such guards to be placed; in other words, that the company had performed its duty by placing the cattle guards far enough away from the cars so as not to be dangerous. For these reasons we think the questions of assumed risk and contributory negligence were for the jury, and that the court could not hold that as a matter of law respondent assumed the risk. The following cases, very much like the case at bar, are in point upon this question: *Sweet v. Michigan Central R. R. Co.,* 87 Mich. 559 (49 N. W. 882); *Johnson v. St. Paul M. & M. Ry. Co.,* 43 Minn. 53 (44 N. W. 884); *Bryce v. Chicago, M. & St. P. Ry. Co.,* 103 Iowa, 665 (72 N. W. 780); *Whipple v. New York, N. H. & H. R. R. Co.,* 19 R. I. 587 (35 Atl. 305, 61 Am. St. Rep. 796).

Two other questions are presented in the case, one of which is the refusal of the court to strike out an answer to a question because it was not responsive. While the court in terms did not strike the answer, it subsequently told the jury that they could not consider evidence of that

character, and this we think was sufficient. The other was an instruction requested by appellant which was modified by the court. The instruction, as given, stated the law correctly. The modification was stated as an exception to the general rule which was being defined. It did not come within the issues of the case, the court did not intend to apply it to the case, and the jury must have so understood it. The respondent did not claim recovery by reason of the exception and at most it was harmless.

We do, however, think the verdict was excessive in proportion to the injury. No bones were broken, and at the time of the trial there were no marks or disfigurements upon the person of respondent, and evidence of any permanent impairment of the respondent was very slight. At the time he was injured he went upon his train with assistance, did some work on the way in, rode from his train home in a buggy, and was in bed for about six days thereafter. The doctor who examined him by the aid of an X ray at the time of the trial could find no evidence of physical injury, and the whole injury at the time of the trial appeared to be to his nervous system, which might or might not remain permanently. It is true that for several months after the injury he was incapacitated for work more or less, and it is no doubt true that he suffered much pain. Counsel for respondent makes a strong argument against this court's reducing the amount, and several cases are cited where we have in effect said it is only in cases where the verdict is clearly in excess of any just measure to such an extent that it shows passion and prejudice on the part of the jury that a verdict will be set aside. It is true, also, that the jury and the court below have advantages in judging of damages which we do not have. But it seems to us that a verdict for $10,000, in a

case where the injuries are so obscure as they are in this case, is clearly in excess of the just measure. In addition to this, the trial court, in passing upon a motion for new trial úpon this ground, said:

"I feel somewhat inclined to sustain the defendant's motion to set aside the verdict as excessive, and grant a new trial, unless the plaintiff remit the damages awarded in excess of $6,000. Should I require the plaintiff to file a remitter in this excess as a condition for overruling the motion and he should decline to do so, he could not appeal from my action without going through a new trial. If he could have my action reviewed by the supreme court without doing this I should feel more inclined to take this course. Should I err in requiring this or in granting a new trial it would entail much more trouble and expense on the parties than if I should err in overruling the motion for a new trial, and besides if the supreme court should conclude that I had erred in this and in no other respect it may itself require the plaintiff to remit a part of his verdict and judgment, or if he declines, reverse and order a new trial. Partially for these reasons and while I have some misgiving on this point as to the damage being excessive, I deem it the better course—the course that will best conserve the rights of both parties—that will present the question for consideration of the supreme court without jeopardizing the rights of either party, to deny the motion."

The trial judge, who heard the evidence, saw the witnesses and was in a position equal with the jury to judge of the damages, was not satisfied that the amount of the verdict was not excessive. He was inclined to reduce the amount to $6,000. He did not do so, because, as he says, he had some misgivings as to the amount being excessive, and because this court would do so if we concluded he had erred in denying the motion on that ground. These statements of the trial court, taken in connection with our own

views from a reading of the evidence, convince us that the verdict is excessive, and that $6,000 is a large measure for the damages proven. The respondent will, therefore, be required to remit $4,000 from the amount of the judgment in the case within thirty days from the date of the filing of this opinion; whereupon the judgment will be affirmed. Otherwise the judgment will be reversed, and a new trial ordered. Appellant to recover costs on this appeal in either event.

: FULLERTON, C. J., and ANDERS and DUNBAR, JJ., concur.