## JUDIS v. BORG-WARNER CORPORATION.

1. Death—Damages—Evidence.

Plaintiff administrator, 66-year-old father of 23-year-old decedent who had started to earn wages some 2-1/2 years before, made a sufficient showing of pecuniary injury resulting from son's death for which damages were recoverable by plaintiff under the death act, where it appears that at the time of his death decedent was doing a considerable portion of the work on 120-acre farm on which the crippled and vision-impaired father was living and contributed $300 a year toward the father's support (CL 1948, § 691.581 *et seq.*).

2. Negligence—Safe Place in Which to Work.

Defendant factory owner was chargeable with negligence of its employees in failing to give proper instructions or to warn decedent, a common laborer, of danger of electrocution in cleaning chimney, where defendant assumed to and did give instructions to the employees of the contractor, the defendant having obligation to furnish the decedent a safe place to do the work and assuming to be, in practical effect, in the position of employer of decedent.

References for Points in Headnotes

[1] 16 Am Jur, Death §§ 211, 236.
[2–5] 35 Am Jur, Master and Servant § 183 *et seq.*
[6–9] 16 Am Jur, Death § 302.

3. SAME—SAFE PLACE AND TOOLS TO WORK.

    Jury could properly find defendant factory owner had assumed relationship and incident duties of employer to plaintiff's decedent, a common laborer, whose immediate employer had contracted with defendant to clean chimney, where there was evidence that defendant's supervisory personnel had failed to warn decedent of proximity of transformers heavily charged with electricity and that a safe place or safe tools were not provided decedent with which to achieve the objective of the employment.

4. SAME—MASTER AND SERVANT—SAFE PLACE TO WORK—MACHINERY —APPLIANCES—MATERIALS.

    An employer is under duty to furnish his employee with a reasonably safe place to work, suitable machinery or appliances, and reasonably safe materials and is negligent if he fails to carry out such duty.

5. SAME—MASTER AND SERVANT.

    An employee who is directed to do work for his employer has a right to assume that it is safe for him to proceed with the tools available for doing the work at the place in which he is directed to perform the work.

6. SAME—EYEWITNESSES—PRESUMPTION OF DUE CARE.

    It will be presumed in the absence of evidence to the contrary that one who was killed accidentally, while performing work for his employer, used ordinary care and caution, where there are no eyewitnesses to the accident.

7. SAME — ACCIDENT — EYEWITNESSES — PRESUMPTIONS — EVIDENCE —INFERENCES.

    The presumption that deceased who was killed as the result of an accident not observed by eyewitnesses was then in the exercise of due care may be overcome by proof by witnesses of facts and circumstances immediately surrounding the accident, from which a fair and reasonable inference may be drawn as to whether or not the deceased had exercised reasonable care.

8. SAME—COMMON LABORER—ELECTROCUTION—FINDING OF DUE CARE —EVIDENCE.

    Jury in action for death of common laborer from electrocution while cleaning defendant's chimney could properly find decedent was in the exercise of due care, where it is not shown that he knew of the presence of the transformers heavily charged with electricity and that without such knowledge he

was careless in placing the long iron handle of his cleaning tool in contact with the transformers.

9. SAME—CHANGE IN CONDITION OF PREMISES—REQUEST TO CHARGE —ARGUMENT TO JURY.

Error, committed by court in failing to give defendant's request to charge that a change in the condition of the premises following decedent's death from electrocution was not a confession by defendant of negligence, *held,* not reversible, where there was an abundance of other facts shown upon which jury could find defendant negligent and the matter of such confession of negligence does not appear to have been argued to the jury.

10. DEATH—DAMAGES—SUPPORT—EVIDENCE—FINDING AS TO INDIGENCY—VOLUNTARY CONTRIBUTION TO SUPPORT OF PARENT.

Fact that plaintiff, a 66-year-old farmer occupying his 120-acre farm, had not been declared by any public authority to be indigent and that neither decedent nor any of his brothers had been ordered by any public authority to contribute to plaintiff's support would not preclude his recovery in amount of $5,000 for death of his 23-year-old son who was voluntarily contributing $300 a year toward support of plaintiff and latter's testimony that he needed the help he got from deceased for support was substantiated by other testimony; it appearing that plaintiff was maimed and had cataracts (CL 1948, § 691.581 *et seq.*).

Appeal from Muskegon; Pugsley (Earl C.), J., presiding. Submitted January 7, 1954. (Docket No. 19, Calendar No. 45,927.) Decided April 5, 1954.

Case by Dominick Judis, administrator of Tony Judis, his son, against Borg-Warner Corporation (Norge Division), for damages resulting from death of son. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Fredric A. Grimm* and *Benjamin Marcus,* for plaintiff.

*Sessions & Barlow,* for defendant.

REID, J. Plaintiff, as administrator of the estate
of his deceased son, Tony Judis, claims damages for
loss of necessary partial support by reason of the
death by electrocution of decedent at defendant's
manufacturing plant in Muskegon operated by de-
fendant's Norge division, caused through negligence
of defendant. Defendant denies its alleged negli-
gence, denies that plaintiff had any legally-enforce-
able right to even partial support by his deceased
adult son, and claims error by submission of the case
to the jury, error in the charge given, and in the
court's refusal to give certain requests to charge the
jury.

Plaintiff has lived since 1916 on his farm at Irons,
Lake county, Michigan; his wife died in 1938; he
remarried in 1948. Decedent was born October 10,
1926, and died January 17, 1950, at the age of 23;
plaintiff's farm is 120 acres, is poor land and does
not produce good crops; plaintiff testified, "I got my
body smashed and I don't feel good today, can't do
no hard labor;" he testified he "had cataracts pretty
bad." The farm does not support plaintiff and his
family; plaintiff was 66 years old when Tony, the
decedent, died; decedent started to earn wages away
from the farm 2-1/2 years before his death and at
the time of his death was contributing $300 a year
toward his father's (plaintiff's) support (an average
of $25 a month), besides doing a considerable portion
of the work on the farm.

There was a sufficient showing of pecuniary injury
resulting from the death recoverable by plaintiff ad-
ministrator under the death act, CL 1948, § 691.581
*et seq.* (Stat Ann and Stat Ann 1953 Cum Supp
§ 27.711 *et seq.*).

David L. Green, an independent contractor, does
business as David L. Green Construction Company
(hereinafter referred to as Green), in Muskegon.
Apparently at least part of Green's business is to

repair and clean up manufacturing plants. Some of Green's employees on January 17, 1950, were engaged in work at defendant's plant in Muskegon. During the 7 previous years Green had been engaged in (among other things) cleaning out the chimney or stack of defendant's plant in question, about twice a year, in pursuance of his (Green's) contractual relations with defendant. Decedent began working for Green on August 31, 1949 but was not present when the stack in question was cleaned out about that time; Mr. LeRoux and Mr. Draper, supervisory employees of Norge, were around when the "hoe" in question (involved in the electrocution of decedent) and other instruments of defendant were being used to clean the stack on occasions previous to the occasion in question. Decedent's superior, Vanderwier, was under instructions from Norge. With the consent of defendant's supervisory employees, the tools of defendant were on former occasions, used by Green's employees in working at defendant's plant in question. The particular "scoop" or "hoe" in question was Norge equipment and Green's employees were privileged to use it at any time. It had been in use a good many years.

The chimney or stack in question was connected with boilers inside of defendant's plant, but was itself situated outside of the plant. To clean it out, it was necessary to make use of a door reached from the outside of the building; the dust that would arise when cleaning operations were begun in the stack, made it prohibitive for the person doing the cleaning to enter inside the stack; the accumulated ashes were first partly removed by a comparatively short-handled shovel, but to reach the remaining ashes further back inside the stack, it was necessary to use a large, scoop or hoe, the handle of which was 12 feet, 3½ inches long. Opposite the door in the stack was a brick wall 4-1/2 feet away and 8 feet high; on top of

the wall was a picket fence about 6 feet high, the pickets being spaced about 2 inches apart. Three transformers on the other side of the wall were invisible to decedent when he went to work at removing the ashes from the stack. There was no warning sign placed there, of danger from electric current from the transformers situated on the other side of the brick wall.

Vanderwier testified as to what instructions he gave decedent. His testimony does not include any statement that he warned decedent concerning the transformers, nor does it appear that any of Norge's supervisory employees gave any such warnings in their instructions to Green's employees. The jury could be justified in concluding that decedent did not know of the presence of the transformers.

Vanderwier testified:

"At the time of the death of Tony Judis I was employed as a carpenter for David L. Green. At that time I was the supervisor of the work being handled by David L. Green Construction Company at the Norge plant. I cannot recall whether Judis died the first or second day he was employed there. It was either the first or second day. Before that he had not been under my supervision. I was the one that instructed him and another man to clean out the stack. * * *

"*Q.* Were you [Tony's superior] given any warning by some one in a supervisory capacity at Norge as to the close proximity of the transformers, that it was dangerous there?

"*A.* No, sir. * * *

"*Mr. Sessions* [attorney for defendant]: David Green had a contract to clean out the stack and that is all.

"*The Witness:* It wasn't a contract. It was done on a cost-plus basis.

"*The Court:* You weren't there under employment by the Green Construction Company?

"*A.* We received our instructions from Norge Company. * * *

"*Q.* How did you expect Tony Judis to clean the back end of that stack if the tool that he had wouldn't reach it?

"*A.* Out beyond the coal pit of the Norge, or where they store their coal, there is a place called the ash dump, and there is a pit. I think that was previously used for fly ash or something. On an occasion or two I have had to clean that pit, and out there is a scoop similar to the one that Tony was using. However, it hadn't come to my mind to point out that particular scoop.

"*Q.* That particular scoop out there was Norge equipment, was it not?

"*A.* Yes.

"*Q.* You were privileged to use it at any time?

"*A.* Yes.

"*Q.* Tell me this, with regard to your doing work there at the Norge, is it not true you and your crew got your instructions from day to day from the Norge Corporation?

"*A.* Yes. If we were going to do any work connected with the boiler room, usually Mr. Draper would tell us what to do. If it was carpenter work or construction work, Mr. Duncan would tell us what to do; and if it was millwright, Mr. Swanson would tell us what to do.

"*Q.* None of that transpired through the David Green office, but directly under instruction of Norge supervisors?

"*A.* Mostly. * * *

"*The Court:* Did I understand he had completed cleaning out the stack before the accident occurred?

"*A.* He was finished. They figured the bottom of the stack was as clean as they could get it in that operation. The tool he was going to use next would have been a wooden-handled hoe or shovel. * * *

"*Q.* The relation, as far as the contract between David Green and Norge was that he would supply

labor and Norge would direct what work was to be done?

"*A.* Yes.     *     *     *

"*Q.* You testified you were privileged to use that tool out on the pit. Were you, in the course of your employment working there at the Norge Company, privileged to use any tool that was reasonably useful for a particular job?

"*A.* I have always been extended that courtesy by the Norge.     *     *     *

"*Q.* And the way you did it was by pushing it [*i.e.,* the "hoe"] in past this brick wall sideways?

"*A.* And got it inside the stack.

"*Q.* As you ran it in, you could walk toward the door with it?

"*A.* That is right.

"*Q.* When you come out, you had to pull back at an angle, using the same pattern at which you went in, didn't you?

"*A.* Approximately the same.

"*Q.* All you could do was scrape around inside of the stack on the opposite end, isn't it?

"*A.* By lifting the poker over your shoulder, you could get the ash within reaching distance of your other implement."

Decedent had grown up on a farm in a sparsely-settled community and had been working apparently at common labor since he became about 20 years of age. The jury could be justified in concluding that decedent had no more than common knowledge as to electricity.

On the day of the accident, decedent was put to work at the job of cleaning the ashes out of the stack through the door in question; his superior, Vanderwier, who put him to work had received instructions from Norge (defendant). Decedent had not cleaned out the stack before. The jury could be justified in concluding that decedent did not know of the dangerous proximity of heavy charges of electricity on the

other side of the brick wall. He proceeded to clean out the ashes and had gotten the work finished, except to take out some remaining ashes which he had drawn by the "hoe" in question near to the door ready to be taken out with the shorter handled scoop shovel. Evidently he then lifted the iron handled hoe over his shoulder in the manner described by witness Vanderwier, to remove it from the stack, at which time the long iron handle went between 2 pickets on top of the brick wall, came in contact with some part of the transformer mechanism, and the electric current was still active along the iron handle in his hands when he was found dying or practically already dead, by his fellow employees. His death was caused by the electric current he then and there received. He had been working at the ash pit alone. It seems evident that decedent had gotten the long-handled hoe in question when he found that his short-handled scoop-shovel was insufficient to reach into the further recess of the stack; the hoe in question was the only implement around the plant that would reach the farthest ashes in the stack. It seems justifiable for the jury to decide that if he had been warned of the dangerous proximity of the electric current in the transformers, he would not have permitted the handle to come in contact with it.

In practical effect the arrangement between Green and Norge (defendant) was that Green should send some of his employees to defendant's plant and defendant undertook to direct such employees what to do and how to do it.

Defendant assumed to and did give instructions to the employees of Green, including decedent. Defendant is thereby chargeable with negligence in not giving proper instructions and warning to Green's employees including decedent. Green would not be expected to reconstruct the plant in general but only to do the necessary repairs and cleaning, *i.e.*, in the

material particular, Green was to do janitor work; the janitor work would not be such as to make the plant a safe place to do work; that would be (as the jury could well find) for the defendant to provide for Green and his employees. In assuming to give instructions to Vanderwier, decedent's superior, defendant assumed the position, in practical effect, of employer of decedent.

The jury could well have found that the hoe in question was not dangerous to use if decedent had known of the dangerous proximity of the electric current, but the hoe and the place where it was used were both dangerous when the employee using the hoe did not know of the danger. Defendant's supervisory employees were present on the occasion in question, knew in general of the work being undertaken, knew that the hoe in question or one similar thereto was the only means on the premises for reaching the back part of the ash-pit in the bottom of the stack, knew that in all human probability the workman who would clean out the ashes would look around the premises for the only implement there present that would accomplish the objective, knew that on previous occasions Green's employees had looked around the premises to find necessary implements to do their work and must have expected the hoe in question to be found and used by Green's employees, and knew of the dangerous proximity of the electric current, but did nothing to warn decedent. Defendant's supervisory employees should not have assumed that the employee of Green would know of the presence of the transformers, and without that knowledge, the use of the hoe in question was highly dangerous, as they, defendant's supervisory employees, must have known.

For duty of employer to warn employees of danger in place of employment, see 38 Am Jur, Negligence, § 127, p 787. See, also, 2 ALR 1389.

The jury could properly have found that by giving Vanderwier (decedent's superior) instructions and in view of all the circumstances, the supervisory employees of defendant assumed the relationship and incident duties of employer of decedent. The jury were justified in finding that the place to work at cleaning the stack, as well as the implement, *i.e.,* the hoe, were both unsafe for an employee who was ignorant of the proximity of the transformers heavily charged with electricity. The jury could well have found that it was in fact the defendant rather than Green (decedent's direct employer) who was furnishing the place to work, the implement used, and that as such employer, defendant actually assumed responsibility for the general work conditions and implements for decedent's work. Green and his employees had been accustomed on former occasions to bring some tools for such work as he was engaged to do for defendant and supplement with use of other tools and implements of defendant found at defendant's plant.

An employer is under duty to furnish his employee with a reasonably safe place to work, suitable machinery or appliances, and reasonably safe materials. See 13 Callaghan's Michigan Digest, Master and Servant, § 74, p 57, citing *Swoboda* v. *Ward,* 40 Mich 420 (15 Am Neg Cas 752, 16 Am Neg Cas 1); *Smith* v *Peninsular Car Works,* 60 Mich 501 (1 Am St Rep 542, 16 Am Neg Cas 42); *Kaukola* v. *Oliver Iron Mining Co.,* 159 Mich 689; *Baucino* v. *Fitzpatrick,* 186 Mich 1; *Thiel* v. *Verschoor,* 235 Mich 373; *Muchler* v. *Johnson,* 280 Mich 527.

An employer is negligent if he fails to furnish a safe place for his employees to work in, and safe appliances or tools with which to do the work. See 13 Callaghan's Michigan Digest 58, citing *Palmer* v. *Michigan Central R. Co.,* 87 Mich 281; *Tangney* v. *J. B. Wilson & Co.,* 87 Mich 453; *Sweet* v. *Michigan Cen-*

*tral R. Co.,* 87 Mich 559; *Schlacker* v. *Ashland Iron Mining Co.,* 89 Mich 253.

Decedent had a right to assume when ordered to clean out the stack that it was safe for him to proceed as he did in fact proceed so to do. There was no eyewitness to the accident. Where there is no eyewitness to the accident, it will be presumed, in the absence of any evidence to the contrary, that the deceased used ordinary care and caution. See *Gilbert* v. *Ann Arbor R. Co.,* 161 Mich 73, and cases there cited; *Gates* v. *Beebe,* 170 Mich 107; *Richardson* v. *Detroit & Mackinac R. Co.,* 176 Mich 413, 422; *Lincoln* v. *Detroit & Mackinac R. Co.,* 179 Mich 189 (syllabus 3) (51 LRA NS 710); *Parsons* v. *DuPont Powder Co.,* 198 Mich 409 (syllabus 5) (LRA 1918A, 406, 16 NCCA 25); *Clark* v. *Lawrence Baking Co.,* 240 Mich 352; *Fenn* v. *Mills,* 243 Mich 634; *Wilkins* v. *Bradford,* 247 Mich 157 (syllabus 4); *Russo* v. *City of Grand Rapids,* 255 Mich 474; *Delfosse* v. *Bresnahan,* 305 Mich 621; *Barry* v. *Elkin,* 332 Mich 427.

In the absence of eyewitnesses, presumption exists that deceased exercised due care which may be overcome by proof by witnesses of facts and circumstances immediately surrounding accident, from which fair and reasonable inferences may be drawn as to whether or not deceased exercised reasonable care. See *Waterstradt* v. *Lanyon Dock Co.,* 304 Mich 437. See, also, *Heckler* v. *Laing,* 300 Mich 139.

In the instant case, it cannot be said that there is any evidence to show directly that decedent knew of the presence of the transformers on the other side of the brick wall; without that knowledge it cannot be said there is any evidence in the case that decedent carelessly placed the long iron handle in contact with the transformers. It was for the jury to decide whether it was want of knowledge as to the transformers, or mere carelessness in handling the long iron-handled hoe, that caused the accident; hence,

the jury could be justified in finding that decedent was free from contributory negligence.

Defendant claims error on the part of the trial court in not giving several requests of defendant to charge the jury, one of which requires attention. By consent of both parties, plaintiff and defendant, a photographic picture of the top of the wall, taken some time after the accident in question, was received in evidence. In the interval, a solid board fence was placed covering the picket fence that was on the top of the brick wall when the accident occurred. The picture having been introduced with defendant's consent, it became necessary to explain that the board fence was placed in position covering the pickets after the accident, because of the testimony that the hoe in question had been shoved by decedent between the pickets. This was not equivalent to an offer of the testimony as to change of condition of the fence as a confession by defendant of negligence.

Defendant requested the court to charge the jury that the placing of the board fence to prevent future recurrence of accidents, similar to the one in question, was not to be regarded by the jury as a confession of negligence on the part of the defendant. The request should have been given and it was error on the part of the court not to give the requested charge. See *Fulton Iron & Engine Works* v. *Township of Kimball,* 52 Mich 146; *Lombar* v. *Village of East Tawas,* 86 Mich 14; *Langworthy* v. *Green Township,* 88 Mich 207; *Zibbell* v. *City of Grand Rapids,* 129 Mich 659. However, in the instant case, there is nothing in the record to suggest that plaintiff argued to the jury that the placing of the board fence after the accident in question, was a confession of negligence causing the accident in question, or that plaintiff in any way relied on the act of defendant after the accident as proof of such negligence

of defendant. There was an abundance of other facts shown in the testimony, on which the jury could well rest their verdict; hence, we conclude that the error should be considered as not reversible, there being no argument for the requested charge to counteract. For like consideration, see *Lombar Case, supra,* at page 19.

Defendant claims error on the ground of submission to the jury of plaintiff's claim for loss of decedent's support, alleging that there was no proof of a fixed legal obligation of decedent to support his father, nor of the father being in need of his son's support.

There is sufficient testimony in the instant case to support plaintiff's claim that his deceased son voluntarily assumed to contribute an average of $25 a month toward plaintiff's support, without any order requiring him (decedent) so to do, and within the ruling of this Court in *Clinton* v. *Laning,* 61 Mich 355, in which we say, p 360, in the converse case of a father voluntarily assuming to support his adult son without an order of the directors of the poor,

"We think that the voluntary assumption of this duty may fairly be regarded as performing a legal obligation, and that expenditures to a proper extent, within the limit which could be laid down by compulsion, are as valid charges as if they had been compelled, and may be considered as on a similar footing."

Defendant further claims that no evidence was produced that plaintiff was indigent or that he had ever been determined to be a poor person under Michigan law or that any steps had ever been taken to fix upon decedent, who was 23 years old at his death, a legal obligation to support or contribute to the support of plaintiff.

There was in fact no testimony to show that plaintiff had ever been determined by any public authority to be indigent and neither decedent nor any of his brothers were ordered by any public authority to contribute to plaintiff's support; but plaintiff testified, "I needed the help I got from Tony for my support," which testimony the jury could have found sufficiently substantiated by other testimony and that such testimony is a correct statement. We think plaintiff's needs, as the jury may be considered to have found, fairly place him within our ruling hereinbefore quoted from the *Clinton Case,* and that the amount of the award, $5,000, is not excessive.

Other questions discussed in the briefs do not require detailed rulings.

The judgment appealed from is affirmed. Costs to plaintiff.

CARR, SHARPE, BOYLES, DETHMERS, and KELLY, JJ., concurred with REID, J.

BUTZEL, C. J., and BUSHNELL, J., concurred in the result.