ERNESTINE SCHLACKER, ADMINISTRATRIX, ETC., v. THE ASHLAND IRON MINING COMPANY.

*Master and servant—Negligence—Assumption of risk—Jury.*

1. It is good ground of challenge for cause that the name of a juror chosen from the regular panel does not appear upon the assessment roll of his township or ward, as required by How. Stat. §§ 7554, 7555.

2. The following propositions are summarized from the opinion of Mr. Justice McGRATH, in which MORSE and LONG, JJ., concur:

    *a*—It is well settled that the master is bound to provide his servant with a safe place in which to work; citing *Van Dusen v. Letellier,* 78 Mich. 492. In other words, he must exercise care in the protection of his employés from the hazards of their employment, and the more hazardous the employment the greater should be the care.

    *b*—Employés on entering into a hazardous employment take the ordinary risks attending that service; but when servants complain of what appears to them to be an impending peril in a position to which they have been ordered, and notify the master of the danger, and ask to be relieved, he cannot refuse to relieve them, insist upon their continuing the work in that position, and, when they remain at his direction, waiting for an inspection which he has promised but neglected to make, relying upon his promise and superior judgment, and fearing the consequences of disobedience, and are injured, be then allowed to say, "You were guilty of contributory negligence in doing what I directed you to do," or "You assumed that risk when you entered my employment."

Error to Gogebic. (Daboll, J., presiding.) Argued April 22, 1891. Decided December 22, 1891.

Negligence case. Defendant brings error. Reversed. The facts are stated in the opinion.

*M. M. Riley (Howard Morris,* of counsel), for appellant.

*Hayden & Young (M. H. Crocker,* of counsel), for plaintiff.

GRANT, J.    Plaintiff's decedent was employed as a trammer in the defendant's mine, and received an injury, while so employed, July 25, 1887, from which he subsequently died.

The ore of this mine is soft hematite.    The two systems of mining this ore are "timbering by square sets" and the "caving-in process."    In the square-set system the ore is mined from the bottom.    In the other process the ore is mined from the top.    The caving-in process was the one used by the defendant at the time of the accident.    In this system a shaft is sunk a short distance, drifts and levels are then run into the body of ore, and small rooms mined out across the vein from the foot to the hanging wall.    Pillars of ore are left between these rooms for support.    The timbering is not made as strong as in the square-set system, and the work is done for the express purpose of allowing the ore above to cave in.    After the rooms on the first level have caved in, similar rooms are again mined out on the next level. When these have caved in, the process is again repeated, as often as is necessary.    No complaint is made against this system of mining.

The duty of the defendant alleged in the declaration is—

"To take care that sufficient ground be left between each level, both as a floor for the upper one and a roof for the one below it; to place strong timbers, strongly supported and braced, against the sides of such rooms, and also against the roof in each chamber, in order to keep the soft, yielding, and slightly cohesive ore or rock of the same character mixed with it from falling down, and to support large masses of the same in the roof of each chamber, to prevent it from falling in."

The neglect of this duty is the negligence alleged. The declaration then sets forth that the roof fell in, and—

"A great concussion of air in said level and room was produced, by means whereof the deceased was knocked down, struck, and blown with great violence."

The situation in this mine will be better understood by a reference to the following diagram:

It is further alleged that defendant negligently failed to warn the deceased of the dangerous condition of the mine, or of the liability of the roof to cave in.

The first level had been mined out previous to the accident, and a portion of it at least caved in. A winze had been sunk to the second level, and chambers 1 and 2 mined out, separated by a pillar of ore. A passage-way had been driven through this pillar about six feet

wide and seven feet high. A chute had been constructed from the second level to the level below, from which to dump the ore for hoisting in the shaft.

The declaration referred entirely to the condition of affairs in the second level. It contained no reference to any defects in the first level. Upon the trial evidence was introduced tending to show that the entire first level had not been caved in before the chambers in the second level were mined out, and that this was not good mining, and was dangerous. This was not counted upon in the declaration as an act of negligence, and can, therefore, form no basis for a recovery.

It was the second chamber of the second level that caved in at the time of the accident. This chamber was directly under the place that had been caved in on the first level. At least so Weisonen, the principal witness for the plaintiff, testifies, and in this he is corroborated by the witnesses for the defense. For full 12 hours previous to the caving, the usual and unmistakable indications thereof appeared. These were apparent to every one at work in the mine in that vicinity. The captain of the mine heard and saw them in the afternoon of the day previous, withdrew the men from chamber No. 2, and gave instructions that no more work be done there, as the ground was about to cave in. The shift boss, Morgan, who had charge of the mine during the night, testifies that he so instructed the men when they went to work on the night shaft. Upon this point there was a conflict of evidence, but the fact remains that no more work was done in that chamber. The only work done that night was in room No. 1, and plaintiff's witnesses agree that they did but little, because the signs of caving in were so clear that, to use their own expression, they "loafed around" in room No. 1 and vicinity, waiting the expected cave-in. Schlacker and his co-employés

fully understood the situation. They had all been employed for some time in the mine, were familiar with the system of mining, and had seen the like operations before. Plaintiff's principal witness, Weisonen, who was a miner, testifies as follows:

" When I went to work on this shift this chamber looked dangerous. I expected it was going to cave in. * * * I thought it was going to cave in because I had seen this mine fall down several times, and the timbers beginning to break. Just above this chamber, on the upper level, I had seen it fall.

"*Q.* Didn't anybody else but you see the danger there was of these timbers caving in?

"*A.* Of course, they all saw it.

"*Q.* Schlacker saw it, did he?

"*A.* Yes, he did.

"*Q.* Did you explain to Schlacker, by motions or otherwise, that it was dangerous, and likely to fall in?

"*A.* I did. * * * I and all the men expected this cave-in to occur, but we didn't expect there would be such a wind."

It thus appears that the deceased and his co-employés had all the information that could be conveyed to them. They needed no other warning of the danger. The result was just what was expected by all, except that the rush of wind was greater. Admittedly they were not compelled to stay there. They were doing substantially no work, and could have gone elsewhere if they had thought there was danger from the rush of wind, which, in any event, was the only danger to be apprehended. In this respect they knew the usual effect as well as the captain or shift boss. When it became apparent that the roof of the chamber was about to fall in, Weisonen told his co-employés, including the deceased, that they had better go out. He testifies that he spoke to them as follows:

" You better go out. Of course the wind will come, and it is liable to hurt us anyhow."

89 MICH.—17.

They were then in room No. 1. A ladder had been placed in the winze, which was 16 feet high, for the ingress and egress of the miners. All but Weisonen started for the winze. He remained behind, to watch the cave-in. The deceased went up the ladder, followed by August Johnson. He had reached the first level just ahead of Johnson, when the rush of wind came, blowing out the lights. Upon relighting their lamps, Schlacker was missing, and was found immediately afterwards at the foot of the shaft, so seriously injured that he died in a few days.

The claim is that he was blown by the force of the wind along the level into the shaft. If this be so, the force of the wind was unusual and unexpected. The circuit judge instructed the jury as follows upon this point, upon which the liability of the defendant turns, viz.:

"I further charge you that the fact ·that the air in this chamber would be displaced and compressed by the caving in thereof, and by the fall of the superincumbent earth and ore in the same, and that such air would be expelled therefrom, and cause a current . through the drift leading from the chamber, which, if such caving were sudden, might be sufficiently strong to carry along, throw down, and injure those in its path, was a danger which was the subject of common knowledge, and readily ascertainable by common observation, and one which the deceased was bound to take notice of as incident to his employment, and the defendant would not be liable for that alone."

This instruction was correct; but he further charged them that—

"If it was known that the air was dangerous under such circumstances, I charge you that it was the duty of the defendant to give timely notice of this danger, and the same time the danger was about to occur, caused by the fall of this ore, so that the danger could be avoided

by the workmen, unless you find that the deceased already had notice from his fellow-workmen or from somebody."

This instruction was erroneous. The deceased and his co-employés had all the knowledge that any one else could have of the approaching fall, and the time when it would probably occur, and the probable effect thereof. They had better knowledge than either the captain or shift boss of the condition of things, neither of whom were present for some hours before the fall. The shift boss was attending to his duties in another part of the mine. Weisonen testifies that he went and informed him that the place was dangerous where they were working, and that they ought to have some other place to work in, and that the shift boss replied: "You had better go ahead. I will come there after a while." Before he came the cave-in had occurred, and meanwhile neither the deceased nor his co-employés did any work. The directions of the shift boss become, therefore, immaterial, for they were not regarded or obeyed. The risk was one of those incident to the business, and which the deceased and his co-employés assumed. The theory of the declaration and of the opening statements of both plaintiff's counsel to the jury was that the caving in was accidental, rather than designed, and that the timbering and the ground left above the second level were insufficient to support the weight above. There was no evidence of any negligent management on the part of the defendant unless it was the failure to "cave down" the whole of the first level before proceeding to excavate the second. But, as already stated, this is not declared upon.

Another claim of the plaintiff is involved in great doubt. If the deceased was not blown into the shaft, then he cannot recover. If he ran or walked into the shaft in his hurry to reach the ladder-way, which extended along it to the surface, or in any other manner,

the plaintiff cannot recover. The force must have been such as to have thrown him down, and carried him headlong, nearly 30 feet, into the shaft. The two who were behind him were uninjured. The ladder, which was placed loosely against the side of the winze, was undisturbed. The hat of August Johnson, who was immediately behind and close to the deceased when the rush came, was not blown off, nor was he blown down. He testifies:

"When the wind came I didn't do anything. I was standing on the side of the drift. I had laid my hands on the side of the rock, holding my hands to the side of the ore. I felt the wind. It was a pretty strong wind."

Mr. Hayden, the learned counsel for the plaintiff, in his opening statement upon the trial, said:

"When the fall occurred every light went out. He could see nothing. None of the rest of the men could see anything, and just exactly what happened then no man, so far as I know, can tell. * * * None of these men saw anything. * * * After it was all over, the deceased was found at the bottom of the shaft. * * * The particular train or catenation of circumstances that occurred between the fall itself and the death, how long it took, and just how it was produced by the general cause which we have alleged, we cannot show by anybody that we know of, for it is impossible."

*Quære.* Under this record, could a jury do anything more than conjecture the manner in which the deceased fell into the shaft?

This disposition of the case renders unnecessary a discussion of the other questions involved. One question, however, is of sufficient importance to be now disposed of. Two of the jurors were challenged for cause by the defendant, for the reason that they were not on the assessment roll of the township from which they were chosen. They were on the regular panel, and were

chosen from the regular list of jurors. These jurors, under our statute, must be selected from persons assessed on the assessment roll of the township or ward. How. Stat. §§ 7554, 7555. This provision cannot be ignored by the supervisors, nor any officers whose duty it is to select the lists. Parties litigant are entitled, under this law, to a panel of jurors whose names are on the assessment roll. Talesmen need not be selected from the assessment roll. *Stewart v. People*, 23 Mich. 63. But that case has no bearing upon this question. The two jurors were incompetent, and should have been excused.

Judgment should be reversed, with costs to the defendant, and a new trial ordered.

CHAMPLIN, C. J., concurred with GRANT, J.

McGRATH, J. I concede that the judgment in this case should be reversed because of the refusal of the court to excuse the two jurors challenged by defendant for cause, but I cannot concur in the views expressed by Mr. Justice GRANT upon the other questions raised.

Mining captains are selected with reference to their superior knowledge and skill in mining operations. Plaintiff's decedent was placed at work in the chamber where the accident occurred by the mining captain; and when complaint was made to the captain of its danger the captain examined the chamber, told the workmen to keep at work, and that there was no danger of a cave-in that night. He was again appealed to during the night, and urged to remove the workmen to some other point. He directed the workmen to go back to their work, saying that he would be there shortly. He paid no further attention to the matter for two hours, at the end of which time the cave-in occurred, and plaintiff's intestate was injured. The case, in this respect, comes within the principle laid down in *Roux v. Lumber Co.*, 85 Mich. 519.

It is well settled that the master is bound to provide his servants with a safe place in which to work. *Van Dusen v. Letellier*, 78 Mich. 492.

In other words, he must exercise care in the protection of his employés from the hazards of their employment, and the more hazardous the employment the greater should be the care. Where methods of operating are adopted which are in themselves most hazardous, as in the present case, the law imposes upon the master a corresponding degree of care. Here the caving was not an accident; it was an incident of the process of mining, with which the persons adopting it must be presumed to be familiar.

Employés on entering into a hazardous employment take the ordinary risks attending that service; but when servants complain of what appears to them to be an impending peril in a position to which they have been ordered, and they notify the master of the danger, and ask to be relieved, the master cannot refuse to relieve them, insist upon their continuing the work in that position, and, where they remain at his direction, waiting for an inspection which he has promised but neglected to make, relying upon his promise and superior judgment, and fearing the consequences of disobedience, and are injured, be then allowed to say, "You were guilty of contributory negligence in doing what I directed you to do," or "You assumed that risk when you entered my employment." Under such circumstances, employés cannot be said to have either heedlessly or voluntarily assumed the risk.

A prompt examination of the mine at the time, and an assurance of safety, would have involved other considerations; but here the inspection was promised, but put off until it was too late. The men waited for what the employer had promised, until the crash came, and deceased was killed in consequence of obedience to his

master's orders.  As to how he came to his death was for the jury.  It does not necessarily follow that he was thrown down, and carried headlong 30 feet into the shaft.  The evidence tended to show that he had reached and was on the ladder; and one witness testified that he (witness) was lifted by the wind bodily part way up the winze-hole, and, falling back, caught and clung to the ladder.

Judgment is reversed, and a new trial ordered.

MORSE and LONG, JJ., concurred with McGRATH, J.