### GLASSBROOK *v.* LANSING WHEELBARROW CO.

1. MASTER AND SERVANT—NEGLIGENCE—PERSONAL INJURIES.

    Testimony that defendant failed to supply customary safeguards for the gearing of its rattlers and to furnish loose pulleys to throw the power off, and that the safeguards could easily and inexpensively have been provided, making it unnecessary for an employee to climb on a barrel to put on a heavy belt by hand, tended to establish negligence, under Act No. 285, Pub. Acts 1909 (2 How. Stat. [2d Ed.] § 4025).

2. SAME—CONTRIBUTORY NEGLIGENCE—PROMISE TO REPAIR.

    Taking the facts as presented by plaintiff's witnesses as true, where plaintiff testified that he did not know of any rule against putting belts on running pulleys, and had been instructed how to put the belts on the rattlers when the machinery was in operation, and had so done for several months, that having become familiar with the danger, he purposed to quit unless the difficulty was obviated, and complained to his foreman who advised him to go ahead, be careful, and use all precautions, and the defects would soon be corrected, he was justified in putting on the belt as he had been instructed to do, and

was not chargeable with contributory negligence as matter of law, nor did the directions amount to a change or revocation of his previous instructions.[1]

3. Same.

Whether the danger was so imminent that no prudent person would undertake to perform the service, was a question of fact: knowledge of the danger was not conclusive evidence of want of care on plaintiff's part.

4. Same—Trial—Argument—Contributory Negligence.

Argument of plaintiff's counsel to the effect that a working man was entitled to wear mittens while he was putting on the belt, if counsel for defendant and himself could wear fur wraps and gloves on the street,—being outside the record,—with other remarks tending to enhance the damages and improperly criticising expert testimony introduced by defendant, was prejudicial and erroneous, where the verdict rendered was large in amount, over $6,500, and where the court in his charge instructed the jury to decide the matter "as it actually affects you."

Error to Ingham; Collingwood, J. Submitted April 9, 1913. (Docket No. 21.) Decided September 30, 1913.

Case by Ellis Glassbrook against the Lansing Wheelbarrow Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Rollin H. Person (C. W. Nichols* and *Harry A. Silsbee,* of counsel), for appellant.

*Gardner & Hood (C. P. Black,* of counsel), for appellee.

---

[1] On the question of attempting dangerous work in obedience to orders, without fully appreciating the danger, see note in 4 L. R. A. (N. S.) 838. The question whether servant's assumption of risk in continuance of work after promise is contributory negligence, as matter of law, is treated in a note in 40 L. R. A. 786. And for effect of promise where danger is great and imminent, see note in 29 L. R. A. (N. S.) 598.

STEERE, C. J. This case comes here by writ of error to review a verdict and judgment obtained by plaintiff on a second trial, in the circuit court for the county of Ingham, wherein he was awarded $6,500 damages for permanent injuries to his right forearm; that member having been drawn between a belt which he was adjusting and its pulley.

Defendant is a manufacturing corporation organized under the laws of the State of Michigan; its business being the manufacture of wheelbarrows, trucks, and various other articles, for which purpose it owned and operated an extensive plant in the city of Lansing, Mich., equipped with power and machinery. As part of its outfit it operated a foundry, woodwork shop, steam boilers, engines, machines, shafts, belts, pulleys, and appliances, and used steam and electricity as motive power. In connection with its foundry it had and used a rattling room 8x20 feet in size, in which were located two rattlers, separated by a board partition running north and south, which divided the space about equally between the two.

A "rattler" is a mechanical device of about one ton weight, driven by power; its object being to smooth and free metal castings from adhering molding sand. This is accomplished by putting the rough castings into a cylinder about 2½ feet in diameter and 6 or 8 feet in length, formed of heavy metal slats or staves, fastened at the ends to flat circular metal heads, and revolving the same rapidly. Plaintiff, when injured, was in defendant's employ, operating said rattlers.

Plaintiff was 40 years of age at the time of his injury and had been intermittently in the employ of defendant and its predecessors in the same business for about six years, during which time he did various kinds of work, such as putting up scrapers and working on different kinds of trucks, wheelbarrows, and spring tooth harrows, also operating at different times both a punch press and a drill press. After

six years of such work he spent some two years on his own farm, returning to the wheelbarrow company in October, 1908. He was put at work on the "rattlers" in question, at which employment he continued until his injury on January 6, 1909.

To the outer side of each metal head of these rattlers was firmly attached a short metal shaft, or axle, one foot in length; said axle passing through wooden boxes which supported the rattler in a horizontal position three feet above the ground, there being no other floor. The two rattlers were set in a row lengthwise, practically east and west in the rattling room. One axle attached to each rattler was connected by a pinion wheel to a countershaft at the south side of and a little behind each. Both countershafts were provided with a tight pulley and connected by a 9-inch leather belt with a corresponding tight pulley on a line shaft which passed through the rattling room in an easterly and westerly direction, and were supported by boxing at a height of 8 feet above the ground, a little to the north and 8 or 9 feet from the countershaft. The pulley on the line shaft and the belt connecting the same with the countershaft were above and in close proximity to the pinion wheels. The line shaft which operated the rattlers was propelled by an electric motor in the cupola room, close to the wall separating that room from the rattling room; the motor was stopped and started by a rheostat upon which was a little lever, pushed from one notch to another in applying or taking off the power. The line shaft, as a rule, ran continuously, and the rattlers were stopped and started from time to time as they were loaded and unloaded; it only taking about an hour to put through a charge of castings. The rattlers only ran when connected to the line shaft by the belting referred to, and this was put on and off as occasion demanded. The belting could be, and generally was, put upon the pulley while the

line shaft was in motion. In order to reach and make this connection, whether the shaft was in motion or not, it was necessary to climb up from the floor upon something, and a heavy oak kerosene barrel was kept on hand for that purpose, which always stood in such a position underneath the shaft that a man standing upon it could with his hands put the belt upon the pulley. It was while doing this that plaintiff was injured. His duties as an operator of the rattler consisted largely in filling and emptying the same; about a ton of new castings being put into the rattler at a time, shut in by a wooden cover to prevent spilling when in motion. It was necessary for the rattler to be stopped while being loaded, and each time it was started the belt had to be adjusted to the pulley on the line shaft.

Plaintiff's declaration, consisting of two counts, charges defendant with negligence in failing to provide loose pulleys for the shafts and countershafts operating the rattler, and in not providing the gearing with proper safeguards, as required by statute; in providing an old, spliced belt with wire lacing which at times formed hooks, as it became worn and broken, which were liable to catch the hands or clothing; that the wooden boxings of the axle of the rattler, to which was attached the pinion wheel connecting the rattler with the countershaft, had been allowed to become worn or loose and the axle or shaft to settle, so that plaintiff was required to greatly exert his strength in putting the belt on the pulley; in not providing plaintiff with a safe place in which to perform his work, nor proper and suitable tools and appliances, furnishing him only a barrel to stand upon when putting the belt on the pulley, which was rendered more difficult by reason of sagging of the shaft, the barrel being unstable and liable to tip over and throw the plaintiff into the gearing. It is also alleged that

plaintiff complained of the machinery being out of repair, and the place unsafe, to defendant's superintendent, who promised to remedy the same but failed to do so before plaintiff was injured; that while plaintiff, in the performance of his duties, was standing upon the barrel endeavoring to place the belt upon the tight pulley on the line shaft while the same was running, as he had been instructed to do, the wire hooks formed by the broken splicing caught the mitten upon his right hand, it being necessary to wear mittens owing to the weather being extremely cold, and, in jerking away to free his hand and avoid being thrown upon the pinion wheels, the barrel tipped, causing him to fall in such manner that his right forearm was drawn between the belt and pulley and crushed. Defendant pleaded the general issue.

The errors alleged and relied on, and the propositions contended for by defendant in its brief, are, generally stated, that plaintiff was guilty of contributory negligence as a matter of law, and the court erred in not directing a verdict for defendant under the undisputed facts; that there is a fatal variance between material allegations in the declaration and plaintiff's own testimony; that various statements were made and language was used by counsel for plaintiff in their argument which amounted to prejudicial and reversible error; that the court erroneously refused certain of defendant's requests and erroneously gave certain instructions as to contributory negligence and the rules by which the jury should be governed in weighing evidence.

The rattlers were old and had been in use for many years. That safeguards were not provided for the gearings, nor loose pulleys for the shafting, to throw the power on and off, is not disputed. Defendant's own witnesses testify that dead or loose pulleys for applying and throwing off the power could have been easily and inexpensively provided. That this would

avoid the time, labor, and risk involved in climbing upon a barrel to put on by hand what defendant's witnesses say was a heavy belt is undisputed. The reason given by defendant for not doing so is that it would be impractical as the sand would wear out the loose pulleys. Section 15, Act No. 285, Pub. Acts 1909 (2 How. Stat. [2d Ed.] § 4025), provides:

"All gearing or belting shall be provided with proper safeguards, and whenever possible machinery shall be provided with loose pulleys."

According to his own testimony, plaintiff knew the dangers and was sufficiently familiar with the machinery to understand just what should be done to make it safer. He testified that, about two weeks, and not more than a month, before the accident, he went to the superintendent of the plant and made complaint of what he regarded as avoidable dangerous conditions, pointing out that the gearing was unguarded; that, instead of getting up on a barrel and lifting the belt to put it on by hand, loose pulleys should be provided, as a matter of convenience and safety; that he also stated the boxings and pinions were worn so that the machinery sagged, making it more difficult to put on the belt, which was spliced and more dangerous to handle, and said that if safeguards were not provided as he suggested and the rattlers were not fixed up he would quit; that the superintendent then promised to put on loose pulleys and make the other repairs as soon as the repair man finished a job he was then on, and requested plaintiff to continue with his work in the meantime, to be careful and use all possible precautions and do the best he could, in view of which promise plaintiff consented to remain. This is denied by the superintendent, who testified that no such complaints were ever made, and that there was no conversation on that subject between them. Plaintiff continued with the work until his injury, with

knowledge of existing dangers and the risks involved, according to his own testimony.

It is plaintiff's claim and testimony that when he began work on the rattlers he was shown, by an experienced employee called for that purpose by the foreman, how to operate the machinery and do his work, and was instructed to put on the belt while the pulley was running in exactly the manner he was attempting to follow when injured; that he had later been reprimanded by the superintendent for having the motor stopped and started to put on the belt; that after he was instructed at the time he commenced work, which was the first time he ever saw a rattler operated, he put the belt off and on both rattlers "an average of about six times a day," and the pulley was rarely stopped for that purpose; that he was not only instructed to put the belt on while the pulley was running, but the foreman and superintendent saw him at his work and were familiar with his manner of doing it. This is denied, and defendant's evidence, by those who instructed plaintiff and worked over and with him, is that he was instructed not to put the belt on a running pulley but to always have the man in charge of the motor stop the machinery for that purpose; and that such was a general and well-known rule of the plant.

The weather was severely cold the day plaintiff was injured, and it was necessary for him to wear mittens at his work. He had them on when injured. This is charged as contributory negligence. Various witnesses who had worked around machinery and put on and off belts, or had seen it done, testified conflictingly on this subject. Some testified that it was improper, dangerous, and an increased risk to put a belt on running machinery with mittened hands; others testified that it was as safe or safer to use mittens, such as plaintiff wore, when putting on a belt, as they prevented the hands from being "burned" or injured;

that if, by mishap, anything was caught, the mittens would catch first and, being loose, would readily slip off and save the hands.

No one else was present when plaintiff was injured. The appliances and conditions were the same as they always had been while he was engaged in that employment and daily putting the belt on and off without accident, except, as he testified, the machinery was getting older and worse from day to day, and it was an exceedingly cold morning. He stated if it was a cold morning the belt would slip. A model of the machine was present at the trial. His testimony, as it appears in the printed record, indicates that he referred to this model and with it illustrated the accident when giving his evidence before the jury. The material parts of his direct testimony on the subject are as follows:

"When I got hurt I was putting on the belt after I had filled the rattlers. The belt that he told me to stop monkeying with propelled the machinery, stopped and started it. * * * When I got hurt I got up on the barrel to put the belt on, and I tried two or three times, I think, to put it on. I would have to get the pieces of the belt over here back again and sometimes it would run off of that large pulley below, and then I would have to get down and put it on over again and then get back up on there again and try to push it up there again, and I finally succeeded in putting it on and during the time the lace catched my mitten, I think, and I kind of yanked back and when I drew myself back the barrel kind of tipped to the north and I lost my balance and was going down towards the rattler; belt went on; and when I started to catch myself from going that way I throwed my arm between the belt and the pulley. * * * In putting on the belt I placed the patched pieces over on the opposite side, the upper side, to get them as far away from me as I could so if the belt slipped on the pulley it would not be apt to catch me. I did that that morning. My arm was drawn up over the pulley; my arm went right in; I drew myself back; it drew me right in like that."

While in a long and grilling cross-examination plaintiff made some modifying concessions and more or less contradictory statements as to details, we think it can fairly be said he adhered in substance to this account of the accident. He was somewhat contradictory as to which hand he used at the pulley in adjusting the belt but finally testified it was the right. He explained and illustrated at length the method of putting on the belt as he had been in the habit of doing, and as he claimed he had been instructed, and testified he did it that morning as usual—

"Just as I always put it on. * * * I could not say which one of my hands the hooks caught; it was done quick; it might have caught this hand, and it might have caught this one; it would not be safe to say. * * * I am just giving my idea about it; I cannot tell just how I stood; when I tipped I tried to save myself; I could not tell how I stood exactly."

He also testified that in doing the work he had in mind, not only the danger of getting caught on the hooks on the belting and placed the patched pieces on the opposite side, but "had the whole thing in mind," and that "the principal danger came from the necessity of putting on that belt and the barrel tipping."

After his injury plaintiff was taken by the superintendent to the office of Dr. Black, whom he says he had never met before, but whose services were evidently satisfactory, as plaintiff stated he was his family physician at the time of the trial. The doctor set the broken bones and dressed the arm without administering an anæsthetic. Plaintiff says he "remained under the doctor's care somewhere about two or three months." The doctor testified that both bones of the forearm were broken in two different places between the wrist and elbow, beginning 2½ inches above the wrist. He described the injury as follows:

"Two bones broken; we call it a double fracture,

and a compound fracture would be a fracture of the bone and a laceration of the soft part so that it would be a double compound fracture. I could determine that there was a laceration by looking at it, as one bone had protruded, made a small hole in the skin; that is what we call where the skin had been penetrated. * * * There seemed to be; the blood under the skin, quite considerable, would show that there was laceration."

Of the condition at the time of the trial he testified:

"I find that there is not a bony union in one break there. It is sometimes called a fibrous or ligamentous union. * * * There is a difference in the terminance of the union even in cases of fibrous union. * * * If it is a short fibrous union, we have use of the arm to a certain extent. I should call this a very short fibrous union. It seems to be quite firm but slips at times; will move. I think the arm as good as could be expected under the conditions. * * * I think the difficulty of the arm is permanent without an operation, and with an operation it might be corrected and he might lose his arm; it is a problematical proposition."

Plaintiff testified that the injury caused him much suffering and loss of sleep; that it was nearly a year after the accident before he "could go to work," first going to work for the Olds people ten months or a year after the injury at $2 per day; that he worked at soldering brass and different metals, earning $3 per day, at time of trial, and worked every day; that he was doing piecework before he was injured and made about $3.50 per day; that he could not do strong manual labor since the injury, although by putting a strap around his arm where the bones failed to knit he could drive nails, etc., but "if I drive a tenpenny nail my arm is paining me almost immediately. Anything that causes a jar, it pains." As a result of this accident he has an impaired arm, caused by a fibrous, instead of a bony, union of the broken bone between the wrist and elbow, and a particularly good

ligamentous union, according to the testimony of his physician. The hand and all joints of the arm are uninjured and no member is gone. Though weakened for heavy work and sensitive to jars, such as driving a tenpenny nail, he has yet a useful arm with which he can work steadily at his present employment at good wages.

Defendant's contention that plaintiff was guilty of contributory negligence as a matter of law is based chiefly upon the claim that his own testimony shows that he wore mittens when putting on the belt, knowing they might be caught by hooks in the lacing; that it was a cold morning and he knew the belt was tighter, more inclined to slip and difficult to put on than usual, thus increasing the risk; that he knew it was a dangerous proceeding at all times to stand upon the barrel and attempt to adjust the heavy belt to the running pulley, and at the same time knew it could be done with comparative safety by stopping the machinery but negligently selected a more dangerous method.

It is undisputed that plaintiff was put to work by defendant in its factory on machinery where no attempt had been made to comply with the statutory requirements before mentioned; the gearing and belting were in no way safeguarded; and no loose pulleys were provided to start and stop the rattlers, which the nature of the work required to be done often. To do this in the performance of his duties plaintiff had to climb and stand upon a barrel several times each day and put the belt on a pulley eight feet above the floor. If the rule of safe place and proper appliances does not make this negligence as a matter of law, it was at least a question of fact for a jury. These were the conditions which confronted plaintiff when he was put at work there, and instructed how to do his work, and under which he could work or quit. He did not control these material conditions. It is his

claim that he was reprimanded for, and ordered to refrain from, using the slower and more safe method of stopping the machinery each time he put on the belt to start the rattlers. He testifies that the superintendent said to him:

"Those belts have been put on right along without starting and stopping those things so many times a day and they can be yet, and that you fellows who don't know anything about it quit monkeying with it."

In passing upon the claim that a verdict should have been directed for defendant, the facts as presented by plaintiff's evidence are to be taken as true.

Plaintiff testified that he had no knowledge of any rule that belts should not be put on running pulleys; that he was instructed and shown how to put the rattler belts on when the machinery was running and did so openly and regularly several times each day during the three months he was engaged in that work. According to his testimony, he discovered, as he became more familiar with his work, defects and dangers, which he thought could be remedied, of so serious a nature that he proposed to quit if they continued; and he so notified the superintendent, who promised they would soon be corrected, urging him to remain. He testifies:

"Mr. Verplanck says, 'We are rushed for those castings; rushed with this work; go ahead and do the best you can and be careful; use all precautions.' And I did so."

It is urged this was a revocation of the previous order, if made, to not stop the pulley to put on the belt. If any such inference can be drawn, it was not made clear to plaintiff, as it should have been by detailed instructions. He had his previous orders as to how to do this work. He was told to be careful and

use all precautions, and, as he understood his orders, he says he did so. Incomplete instructions are sometimes no better than none at all. *Martin* v. *Shingle Co.*, 168 Mich. 175 (130 N. W. 614, Ann. Cas. 1913C, 124).

Even though plaintiff knew the danger and had threatened to quit, it was not negligence as a matter of law to continue the work as before for a time, expecting and relying upon a promise of repairs soon to be made. The rule upon this subject is concisely given in *Missouri Furnace Co.* v. *Abend,* 107 Ill. 44 (47 Am. Rep. 425), as follows:

"It is now uniformly stated by text-writers, that where the master, on being notified by the servant of defects that render the service that he is engaged to perform more hazardous, expressly promises to make the needed repairs, the servant may continue in the employment a reasonable time to permit the performance of a promise in that regard without being guilty of negligence. * * * He may recover, unless when the danger is so imminent that no prudent person would undertake to perform the service. * * * The doctrine * * * rests on sound principle and" is "supported by English and American decisions."

Whether the danger is so imminent no prudent person would undertake to perform the service is usually a question of fact. The rule is fully recognized in this State *(Lyttle* v. *Railway Co.,* 84 Mich. 289 [47 N. W. 571] ; *Schlacker* v. *Mining Co.,* 89 Mich. 253 [50 N. W. 839]), and very strongly stated in the latter case. Knowledge of danger which one has failed to avoid is not conclusive evidence of negligence. *Roux* v. *Lumber Co.,* 85 Mich. 519 (48 N. W. 1092, 13 L. R. A. 728, 24 Am. St. Rep. 102).

Many of the foregoing material facts testified to by plaintiff are strongly controverted, and a review of the evidence, taken as a whole, gives the case a different coloring from that indicated by bare recitals

from his testimony, but we are convinced that the conflicting testimony renders plaintiff's contributory negligence a question of fact within the province of the jury, to be decided by the jury under appropriate instructions.

Serious complaint is made of certain portions of the argument of plaintiff's counsel to the jury, in which it is claimed unfair and unchecked appeals were made to the sympathy and prejudices of the jury. Some of the matters objected to are as follows:

In speaking of the use of mittens while putting on the belt, counsel said:

"It is a funny thing if Brother Nichols and I can go down the street clothed in our long fur wraps and with our gloves on, and the workman cannot have a canvas mitten on to work."

This appeal to the masses against the classes appears to be entirely *dehors* the record. We have searched the record in vain for a word of evidence as to the length and quality of the fur wraps and gloves of the gentlemen mentioned and find no intimation even that they ever owned any such articles of wearing apparel.

In discussing the question of damages, counsel said:

"He may lose his life some time in the future because he is not able to use what would have been a good right arm to protect himself with. He may not be able to protect a child that belongs to him that would be his duty to do. * * * He is entitled to use that arm for his protection in time of danger, all of those things, and it is for you to estimate as best you can the damage he has sustained."

Of a physician called as a witness by defendant, counsel said:

"No man had the power to tell how much that arm was mangled underneath the flesh and yet Dr. Toles

wanted to intimate to you that he did. Dr. Toles could have been called upon the stand by us, in my humble judgment, and asked him the question, if he had been our witness, and he would have explained it in our way. Talk about. experts— * * * Time and time and time again lawyers everywhere are disgusted with that phase of testimony if they tell the truth. * * * For men like him to come before intelligent men like you knowing more about those appliances than he does and tell you how an injury happened time and time again. It is not fair."

These and other remarks more or less outside the line of legitimate argument were timely objected to and exception taken to their continuance. They were not checked by the court, nor the objections ruled upon, so far as the record discloses, though it appears that at least a portion of them were called to the attention of the court at the time. Neither was the jury either instructed in what manner to regard or to disregard such comments. In concluding its charge to the jury the court said:

"It is your sworn duty to decide this matter as it actually affects you, and after you have so decided and deliberated you will return to this room with your verdict."

In view of other portions of the charge correctly defining the duty of the jury, this might ordinarily be regarded as an incidental and unimportant conclusion of the instructions; but as the last word of the court, following the last argument of counsel in which it was sought, unchecked and outside the record, to affect the minds and arouse the emotions of the jury by appeal to prejudice and sympathy, we are impelled to the view, strengthened by the size of the verdict rendered, that the combined result was inimical to a fair and impartial trial, was prejudicial and reversible error.

The judgment is reversed, and a new trial granted.

MOORE, BROOKE, MCALVAY, and STONE, JJ., concurred with STEERE, C. J.

OSTRANDER, J. *(dissenting).* I think no reversible error is made to appear and that the judgment should be affirmed.

KUHN and BIRD, JJ., concurred with OSTRANDER, J.